[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Montgomery*, Slip Opinion No. 2022-Ohio-2211.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-2211

THE STATE OF OHIO, APPELLEE, *v*. MONTGOMERY, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Montgomery*, Slip Opinion No. 2022-Ohio-2211.]

*Criminal law—Right to a fair trial—Sixth and Fourteenth Amendments to the U.S. Constitution—Structural error—Designating alleged victim of rape as the state's representative and seating her at prosecutor's table throughout trial undermines the fairness of the fact-finding process and erodes a defendant's presumption of innocence.*

(No. 2020-0312—Submitted January 27, 2021—Decided June 30, 2022.)

APPEAL from the Court of Appeals for Stark County, No. 2019CA00012, 2019-Ohio-5178.

_____

STEWART, J.

{¶ 1} In this discretionary appeal, we are asked to consider whether a criminal defendant's right to a fair trial, a right guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, is denied when the

alleged victim is introduced to the jury as the state's designated representative and is permitted to sit at counsel table with the prosecutor during the entirety of the proceedings. In this case of first impression in this court, we conclude that it is, because doing so undermines the fairness of the fact-finding process and erodes the presumption of innocence accorded a criminal defendant. We reverse and remand for a new trial.

## I. RELEVANT BACKGROUND

{¶ 2} Appellant, Theodis Montgomery, was tried and convicted for raping and kidnapping A.B. The two met through family members and had known each other for approximately ten years. The events giving rise to the charges occurred on March 16, 2018, at A.B.'s father's house. A.B. and Montgomery were the only people present.

{¶ 3} The crux of Montgomery's defense was consent. According to A.B., Montgomery punched her, raped her, and kept her at the house against her will for most of the day. After Montgomery allowed her to leave, A.B. called her sister and the police to report the incident. She also went to Mercy Medical Center, where she was examined by a sexual-assault nurse and interviewed by two members of the Canton police department. The examination report indicates that A.B. had ruptured blood vessels on the outside corner of her right eye, that she had pain on the right side of her forehead and nose, and that her lower lip was lacerated and painful when touched. DNA analysis confirmed the presence of Montgomery's semen in A.B.'s vagina.

{¶ 4} In August 2018, Montgomery was indicted on one count of kidnapping in violation of R.C. 2905.01(A)(4) and (B)(2) (the defendant, by force, threat, or deception, removed the victim or restrained the victim's liberty with purpose to engage in sexual activity against the victim's will or by force, threat, or deception, under circumstances that created a substantial risk of serious physical harm to the victim, restrained the victim of her liberty). The kidnapping count

included two specifications: (1) it was committed with a sexual motivation, R.C. 2941.147, and (2) Montgomery was a repeat violent offender, R.C. 2929.149. Montgomery was also indicted on one count of rape in violation of R.C. 2907.02(A)(2) (the defendant engaged in sexual conduct and purposely compelled the victim to submit by force or threat of force), also with a repeat-violent-offender specification. Montgomery pled not guilty, and the matter proceeded to a jury trial.

{¶ 5} Before the prospective jurors came into the courtroom for voir dire, the prosecutor told the court that the state intended to designate A.B. as its representative pursuant to Evid.R. 615(B)(3) and (4).[1] Montgomery's counsel objected. Montgomery's counsel also objected to allowing A.B. to sit at the prosecutor's table during the trial, arguing that her appearance there would be prejudicial to Montgomery. After a brief discussion, the trial court granted the state's request, but the judge noted that she intended to research the issue to make sure that "there's not some concern that I'm not contemplating at this point. * * * I'm interested in making sure everyone's rights are being attended to and cared for, and I don't want to create prejudice on either side."[2] After the prospective jurors were seated in the courtroom, the judge introduced everyone at both counsel tables. She introduced A.B. as the state's designated representative. Following a three-day trial, the jury found Montgomery guilty of kidnapping and rape. He was also found guilty of the repeat-violent-offender specification but not of the sexual-motivation specification. The trial court imposed a ten-year sentence on each count, to be served concurrently.

---

1. Evid.R. 615(B)(3) excludes from an order for the separation of witnesses any person whose presence is shown to be essential to the presentation of the party's cause; Evid.R. 615(B)(4) excludes the alleged victim from any separation order.

2. The trial court judge evidently recognized that the state's request was problematic, prompting her to express a desire to research any issues surrounding the request. However, there is nothing in the record showing whether the judge followed through with her intention to research the issue.

{¶ 6} Montgomery appealed to the Fifth District Court of Appeals, arguing that he was denied his right to a fair trial, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, when the trial court allowed A.B. to remain in the courtroom as the state's designated representative. 2019-Ohio-5178, ¶ 16. The court of appeals affirmed. Montgomery appealed to this court, and we accepted jurisdiction to review a single proposition of law from Montgomery's memorandum in support of jurisdiction:

> An Appellant is denied his right to a fair trial guaranteed by the 6th and 14th amendments to the United States constitution when a trial court permits an alleged victim to be introduced to the jury during voir dire as representing the State of Ohio and permits them [sic] to sit with the Prosecutor for the State at counsels table throughout the entire trial in front of the jury.

See 158 Ohio St.3d 1487, 2020-Ohio-1634, 143 N.E.3d 528.

## II. ANALYSIS

A. *The Right to a Fair Trial Under the Sixth and Fourteenth Amendments to the United States Constitution*

{¶ 7} The right to a fair trial stems from the Sixth Amendment to the United States Constitution, which states:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining

witnesses in his favor, and to have the Assistance of Counsel for his
defence.

This right is applicable to the states through the Fourteenth Amendment. *See
Ramos v. Louisiana*, ___U.S. ___, ___, 140 S.Ct. 1390, 1397, 206 L.Ed.2d 583
(2020). One of the rights guaranteed to a criminal defendant by the Sixth
Amendment is the right to be tried by an impartial jury. *Id*.; *Duncan v. Louisiana*,
391 U.S. 145, 156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). "[T]he definition of
impartiality is not a static concept, but can be defined only in relation to specific
facts and circumstances." *Farese v. United States*, 428 F.2d 178, 179 (5th
Cir.1970), citing *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d
1250 (1959).

{¶ 8} The Fourteenth Amendment provides added protection for a fair trial
in its equal-protection and due-process clauses. *See Estelle v. Williams*, 425 U.S.
501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) ("The right to a fair trial is a
fundamental liberty secured by the Fourteenth Amendment"); *see also State v.
Lane*, 60 Ohio St.2d 112, 114, 397 N.E.2d 1338 (1979), quoting *In re Murchison*,
349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (" 'A fair trial in a fair tribunal
is a basic component of due process' "). What constitutes fairness is not discrete.
"[C]ourts must be alert to factors that may undermine the fairness of the fact-finding
process * * * and carefully guard against dilution of the principle that guilt is to be
established by probative evidence and beyond a reasonable doubt." *Estelle* at 503,
citing *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). "It
is well established that the mere probability of deleterious effects on fundamental
rights calls for close judicial scrutiny." *Lane* at 115.

{¶ 9} In *Lane*, this court addressed the constitutional right to a fair trial. *Id.*
at 114. The trials for three men who were imprisoned at the Southern Ohio
Correctional Facility and who had been charged with escaping from the facility

began in a county courthouse. (Two of the men were tried jointly.) Following voir dire in one trial, and during voir dire in the second, the state orally moved to transfer the trials to the prison. Over objections, the court granted the state's motion to hold the trials at the prison, citing security and convenience. This court held that allowing the trials to proceed in the confines of the prison denied the men the fundamental right to a public trial, *id.* at paragraph two of the syllabus, and undermined the jury's impartiality, eroded the presumption of innocence, and chilled the rights of the inmates to obtain witnesses, *id.* at paragraph one of the syllabus. This court noted that the setting transmitted too great an impression of guilt, *id.* at 115, and we held that the trial "offend[ed] due process as being fundamentally unfair because of the inherent potential for prejudice." *Id*. at 118. Likewise, here we consider whether introducing the alleged victim as the state's representative and seating her at the prosecutor's table, where she remained during the entirety of the proceedings, undermined the fairness of Montgomery's trial.

*B. Marsy's Law and Evid.R. 615(B)*

**{¶ 10}** As an initial matter, the Fifth District Court of Appeals resolved Montgomery's objection and challenge on direct appeal by applying Ohio Constitution, Article I, Section 10a, a provision known as Marsy's Law, and Evid.R. 615(B), in support of its decision to allow A.B. to sit at the prosecutor's table. The constitutional provision states that a victim is entitled to be present at all proceedings; the evidence rule states that an alleged victim need not be excluded from a proceeding so as not to hear the testimony of other witnesses. The trial court overruled Montgomery's objection, citing the alleged victim's right to be present in the courtroom under Marsy's Law. On appeal, Montgomery argued that the trial court erred because Marsy's Law does not provide for the victim to be the state's designated representative. The court of appeals overruled this assignment of error. 2019-Ohio-5178 at ¶ 25.

{¶ 11} For decades, Ohio law has given victims of crime the right to be present in the courtroom during criminal proceedings against an accused. R.C. 2930.09. In 2017, an amendment to the Ohio Constitution, Marsy's Law, established additional constitutional due-process rights for victims and reiterated their right to be present at all public criminal proceedings for the accused. Ohio Constitution, Article I, Section 10a(A)(2).

{¶ 12} Evid.R. 615 governs the separation and exclusion of witnesses. Evid.R. 615(A) provides in part: "Except as provided in division (B) of this rule, at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses * * *." Evid.R. 615(B) exempts the following persons from orders for the separation and exclusion of witnesses:

(1) a party who is a natural person,

(2) an officer or employee of a party who is not a natural person designated as its representative by its attorney,

(3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, and

(4) in a criminal proceeding, an alleged victim of the charged offense to the extent that the alleged victim's presence is authorized by the General Assembly or by the Ohio Constitution.

{¶ 13} The case before us, however, does not involve a challenge to the alleged victim's right to be present in the courtroom. This case involves designating the alleged victim as the state's representative and seating her at the

prosecutor's table. Neither the trial court nor the court of appeals acknowledged this distinction.[3] But the distinction is significant.

{¶ 14} Although Marsy's Law gives a victim the right to be present at all critical stages of the criminal proceedings and Evid.R. 615(B)(4) exempts a victim from an order of separation and exclusion of witnesses, neither provision addresses allowing the victim to sit at the prosecutor's table as the state's designated representative. And it is not the role of the judiciary, as the trial court and the court of appeals have done in this case, to enlarge the language of these provisions to authorize a victim to do so. *Weaver v. Edwin Shaw Hosp.*, 104 Ohio St.3d 390, 2004-Ohio-6549, 819 N.E.2d 1079, ¶ 13. In any event, Montgomery is not challenging A.B.'s right under Marsy's Law to be present in the courtroom and he did not request A.B.'s exclusion from the courtroom as a witness pursuant to Evid.R. 615. Therefore, these provisions are inapplicable.

*C. The Trial Court Erred in Designating the Alleged Victim as the State's Representative and Allowing Her to Sit at the Prosecutor's Table*

{¶ 15} When the prospective jurors entered the courtroom, the judge stated:

> I'd like to introduce everyone in the room to you so you know who we all are. Representing the State of Ohio in every criminal case here in Stark County is the Stark County Prosecutor's Office. The Stark County Prosecutor is John Ferrero, representing his office today is Attorney Mike Bickis.
>
> * * *

---

3. Montgomery sought reconsideration of the court of appeals' decision, asserting that his right to a fair trial was violated and the presumption of innocence was impaired when A.B. was designated as the state's representative and allowed to sit at the prosecutor's table during the entire trial. The court of appeals overruled the application on the basis that it failed to call attention to an obvious error in the court's decision or to raise an issue that the court had failed to consider.

And seated with him is the State's representative in this case, Miss A.B.

**{¶ 16}** The victim of an alleged crime is not a party to the criminal proceedings against the defendant. *State v. Yerkey*, 2020-Ohio-4822, 159 N.E.3d 1232, ¶ 25 (7th Dist.). Additionally, the victim of an alleged crime is not a surrogate of the state. It is therefore incongruous that a victim could be designated as the representative for the state during the prosecution of the defendant.

**{¶ 17}** The prosecuting attorney is the state's legal representative in all criminal matters. R.C. 309.08(A); *State v. Heinz*, 146 Ohio St.3d 374, 2016-Ohio-2814, 56 N.E.3d 965, ¶ 21. And while it is common practice for the prosecuting attorney to designate an individual to be a personal representative of the state and sit at counsel table during a criminal trial, *State v. Lewis*, 70 Ohio App.3d 624, 640, 591 N.E.2d 854 (4th Dist.1990), as the state and the second dissenting opinion note, there is no statute or rule that explicitly dictates who that person can be. However, given that the state's selection of a representative to sit at counsel table and remain in the courtroom throughout the proceedings is a subject that, if challenged, is routinely done in the context of witness separation, Evid.R. 615(B)(2) may be viewed as implicitly and logically limiting the state's selection of a representative to a person who is an officer or employee of the state. *Marr v. Mercy Hosp.*, 6th Dist. Lucas No. L-97-1160, 1998 Ohio App. LEXIS 2227, *5 (May 22, 1998), citing *State v. Lapping*, 75 Ohio App.3d 354, 363, 599 N.E.2d 416 (1991); *see also State v. Hartzell*, 2d Dist. Montgomery No. 17499, 1999 Ohio App. Lexis 3812 (Aug. 20, 1999) (trial court erred when it allowed the state to designate a representative who was not an officer or employee of the state).

**{¶ 18}** The state concedes that A.B. does not meet the criteria to be designated as the state's representative under Evid.R. 615(B)(2) but argues that the trial court's introduction and references to A.B. as the state's representative did not

prejudice Montgomery or bolster A.B.'s credibility, because the references were limited. Furthermore, the state argues that A.B.'s credibility was not bolstered because the prosecutor never remarked on her credibility. The state and the second dissenting opinion point out that while there is no specific Ohio law that permits the alleged victim to sit at the prosecutor's table, there is no specific law that prevents that conduct. Both the state and the second dissenting opinion are missing the point. Regardless of whether there is any explicit prohibition against seating the alleged victim at the state's counsel table, we must decide whether doing so violated Montgomery's right to a fair trial.

{¶ 19} The presumption of innocence accorded an accused is a basic component of a fair trial; it is our duty to be alert to factors that undermine fairness in the fact-finding process and dilute the right to this presumption. *Lane*, 60 Ohio St.2d at 115, 397 N.E.2d 1338. Although the trial court's introduction of A.B. as the state's representative might have been brief, the designation of A.B. as the state's representative was error, and that error was compounded when she was allowed to sit at the prosecutor's table throughout the trial in her dual role as the victim of the alleged crime and as the representative of the state charged with prosecuting Montgomery for that alleged crime. As we established in *Lane*, this court must be vigilant to ward against scenarios that undermine a jury's impartiality, erode the presumption of innocence, and allow for a setting that transmits too great an impression of guilt and that offends due process as fundamentally unfair because of the inherent potential for prejudice. The scenario at issue in this case triggers these factors.

{¶ 20} The second dissenting opinion states that "there is support in Ohio [for the proposition] that the state may choose anyone, including a deceased victim's wife, to serve as the state's representative so long as the person's presence is not used in an inappropriate manner," dissenting opinion of Fischer, J., ¶ 130. However, this assertion is supported by a single Ohio court of appeals opinion, *see*

*State v. Bryant*, 105 Ohio App. 452, 454, 152 N.E.2d 678 (2d Dist.1957). The additional case cited by the second dissenting opinion does not support this broad proposition. *State v. Lewis*, 70 Ohio App.3d 624, 640, 591 N.E.2d 854 (4th Dist.1990), states only that a trial court's decision to allow a county sheriff to be the state's representative and sit at the state's counsel table was not prejudicial to the defendant.[4]

{¶ 21} The state argues here that the trial court's decision falls within the protocol under Evid.R. 615. However, the state's and the trial court's improper reliance on Evid.R. 615 notwithstanding, the fundamental question we must answer is not whether the state may choose whomever it wants as its representative at a criminal trial and seat that representative at the prosecutor's table, as the second dissenting opinion reframes the issue before us. Rather, the question we must answer is whether permitting the state to designate A.B. as the state's representative and allowing her to sit at counsel table infringed on Montgomery's right to a fair trial. The second dissenting opinion ignores the constitutional issue before us and focuses primarily on what it calls the state's common-law right to choose whomever it wants as its designated representative and to have that person seated at counsel table, as long as the choice is not made for improper purposes. The second dissent's focus is misplaced.

---

4. Although we disagree with the second dissenting opinion's reliance on *Bryant* to declare that the state may choose anyone it wants to be designated its representative, that opinion fails to point to anything in the record showing that A.B. was chosen as a representative to provide assistance to the state in prosecuting Montgomery. Although the prosecutor cited Evid.R. 615(B)(3) and (4) as the basis for his request to have the victim sit at counsel table, he asked for the victim to be designated as the state's representative, which falls under Evid.R. 615(B)(2). Furthermore, at no time did the prosecutor assert, let alone demonstrate, that the victim was essential to the state's presentation of the case pursuant to Evid.R. 615(B)(3), nor did he explain why the victim should be the state's representative. But even if the state had made any attempt to demonstrate why designating A.B. as the state's representative and having her sit at counsel table was necessary to prosecute the case against Montgomery, the state's justifications would still be outweighed by Montgomery's constitutional right to a fair trial.

{¶ 22} As noted earlier, Evid.R. 615(B)(2) implicitly limits the personal representatives from which the state may choose to officers or employees. But assuming without deciding that the state does have the right to designate as its personal representative someone other than an officer or an employee (or in the second dissenting opinion's words, "anyone"), that right is inferior to a criminal defendant's constitutional rights. *See State v. J.M.*, 10th Dist. Franklin No. 14AP-621, 2015-Ohio-5574, ¶ 28 ("the state and the defendant in a criminal case do not have the same rights"). The second dissent's emphasis on the state's right to choose its representative rather than on Montgomery's right to a fair trial provides no justification for affirming the judgments of the lower courts.

{¶ 23} Seating A.B. at the prosecutor's table reinforced the error of designating her as the state's representative. It risked misleading the jury into thinking that just as defense counsel represents the defendant, the prosecuting attorney represents the alleged victim, or even more harmful, that the alleged victim as the complaining witness and the prosecution are one and the same. We find that the victim's dual role warped the framework within which the trial proceeded. *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

{¶ 24} Just as we determined in *Lane* that the unconventional act of holding a criminal trial inside a prison offended due process because it was fundamentally unfair, we find that the unconventional acts of designating an alleged victim as the state's representative and allowing her to sit at the prosecutor's table eroded the presumption of innocence accorded Montgomery and violated his fundamental right to a fair trial, in violation of the Sixth and Fourteenth Amendments.

### III. REMEDY

{¶ 25} In general, " 'a constitutional error does not automatically require reversal of a conviction.' " *Weaver v. Massachusetts*, ___U.S. ___, ___, 137 S.Ct. 1899, 1907, 198 L.Ed.2d 420 (2017), quoting *Fulminante* at 306. For purposes of determining whether a conviction should be reversed, the Supreme Court has

divided constitutional errors into two classes: "trial errors," which are reviewable for harmless error, and "structural errors," which are per se cause for reversal. *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9, citing *Fulminate* at 306-312, and *State v. Esparza*, 74 Ohio St.3d 660, 661, 660 N.E.2d 1194 (1996). Most constitutional errors are trial errors. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). Trial errors occur during " 'presentation of the case to the jury' and their effect may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.' " (Brackets sic.) *Id.*, quoting *Fulminante* at 307-308. A constitutional trial error is harmless when the state demonstrates " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Weaver* at ___, 137 S.Ct. at 1907, quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

{¶ 26} On the other hand, a constitutional error is structural when it affects the framework in which the trial is conducted, rather than simply being an error in the trial process itself. *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 20. " 'The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial.' " *Id.* at ¶ 21, quoting *Weaver* at ___, 137 S.Ct. at 1907. Structural errors defy analysis under harmless-error standards, *id.* at ¶ 20, and the effect of these errors is unquantifiable in the context of an entire trial, *Gonzalez-Lopez* at 150.

{¶ 27} In *Weaver,* the Supreme Court identified three broad rationales for finding that a constitutional error is structural. *Weaver* at ___, 137 S.Ct. at 1908. A constitutional error has been deemed structural when the right that is violated protects an interest other than protecting the defendant from erroneous conviction, like an accused's fundamental right to conduct his own defense and direct the

13

manner in which he protects his own liberty. *Id.*, citing *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

{¶ 28} The Supreme Court has deemed a constitutional error structural when the effects of the error are too difficult to measure. *Weaver,___*U.S. at ___, 137 S.Ct. at 1908, 198 L.Ed.2d 420. "For example, when a defendant is denied the right to select his or her own attorney, the precise ' "effect of the violation cannot be ascertained." ' " *Id.*, quoting *Gonzalez-Lopez*, 548 U.S. at 149, 126 S.Ct. 2557, 165 L.Ed.2d 409, fn. 4, quoting *Vasquez v. Hillery*, 474 U.S. 254, 263, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). As a practical matter, in regard to this type of error, the government will find it almost impossible to show that the error was harmless beyond a reasonable doubt. *Id.*

{¶ 29} Finally, a constitutional error has been deemed structural when it always results in a trial that is fundamentally unfair. *Id.* For example, a trial court's failure to give a reasonable-doubt instruction always results in a trial that is fundamentally unfair. *Id.*, citing *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1983). The rationales for why an error is deemed structural are not rigid, and more than one may explain why an error is ultimately held to be structural. *Id.* Constitutional errors that have been deemed structural have included the presence of a biased judge, *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); the introduction of a coerced confession, *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); and the unlawful exclusion of members of the defendant's race from a grand jury, *Hillery*. These errors permeated the "entire conduct of the trial from beginning to end," *Fulminante*, 499 U.S. at 310, 111 S.Ct. 1246, 113 L.Ed.2d 302, and "[w]ithout these basic [constitutional] protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence," *Rose v. Clark*, 478 U.S. 570, 577-578, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), citing *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

**{¶ 30}** Designating A.B. as the state's representative and seating her at the prosecutor's table throughout the proceedings undermined the "structural integrity of the criminal tribunal itself," *Hillery* at 263-264. They were errors that permeated the entirety of the proceedings, and the effect of these errors is too difficult, if not impossible, to measure. Allowing the victim to be introduced as the state's representative and sit at the counsel table with the prosecutor are not merely trial errors, which can be assessed for any harm caused to Montgomery in light of the evidence presented against him. To the contrary, there is no way to gauge the impact these errors had on the fundamental fairness of Montgomery's trial. *See Gonzalez-Lopez*, 548 U.S. at 150, 126 S.Ct. 2557, 165 L.Ed.2d 409 ("Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe").

**{¶ 31}** The errors that occurred in Montgomery's trial are not akin to the state's vouching for the credibility of a witness, *see State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 145 (explaining that vouching occurs when the prosecutor implies knowledge of facts outside the record or expresses a personal opinion about the credibility of a witness). Instead, like other structural errors that infect the entire framework of the trial from beginning to end, *see Tumey* (denial of right to impartial judge), and *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (denial of right to counsel), the errors in this case influenced the entire trial; the errors conflated the role of the victim and prosecutor and transcended the criminal process. *Fulminante* at 311. A.B.'s being designated as the state's representative and being seated at the counsel's table throughout the trial cannot be quantitatively assessed in the context of the other evidence that was

presented.[5]  Put simply, Montgomery's trial did not and could not reliably serve its function as a fair and appropriate venue for the determination of his guilt.

{¶ 32} The first dissent recognizes that the United States Supreme Court has categorized structural errors as " ' "highly exceptional," ' " dissenting opinion of Kennedy, J., ¶ 118, quoting *Greer v. United States*, ___ U.S. ___, ___, 141 S.Ct. 2090, 2100, 210 L.Ed.2d 121 (2021), quoting *United States v. Davila*, 569 U.S. 597, 611, 133 S.Ct. 2139, 186 L.Ed.2d 139 (2013), and we do the same.  But we also believe that seating a victim next to the prosecutor at the counsel's table and identifying her as the state's representative is such an exceptional scenario that renders a trial an unreliable vehicle for determining guilt or innocence.  *See Greer* at ___, 141 S.Ct. at ___, citing *Neder v. United States*, 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).  Accordingly, we conclude that the court's errors of allowing A.B. to be introduced as the state's representative and to be seated at the counsel table with the prosecutor infringed on " 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error,' " *Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E. 3d 872, at ¶ 26, quoting *Chapman*, 386 U.S. at 23, 87 S.Ct. 824, 17 L.Ed.2d 705.  We therefore hold that Montgomery is entitled to an automatic reversal of his conviction.

## IV.  CONCLUSION

{¶ 33} " 'Fairness of course requires an absence of actual bias * * *.  *But our system of law has always endeavored to prevent even the probability of unfairness.*' "  (Emphasis added.)  *Lane*, 60 Ohio St.2d at 114, 397 N.E.2d 1338, quoting *Murchison*, 349 U.S. at 136, 75 S.Ct. 623, 99 L.Ed. 942.  To " 'perform its high function in the best way, "justice must satisfy the appearance of justice." ' "  *Id*. at 114-115, quoting *Murchison* at 136, quoting *Offutt v. United States*, 348 U.S.

---

5. The first dissenting opinion spends a considerable amount of time recounting various details of the trial proceedings.  But because we hold that the errors are structural, a review of the details of the trial is irrelevant to our analysis.  *Gonzalez-Lopez* at 150.

11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954). We hold that the trial court denied Montgomery of his constitutional right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution by permitting the alleged victim to sit at the prosecutor's table during the criminal trial and to be designated and introduced to the jury as the state's representative. These errors are structural and require reversal. In so holding, our decision does not infringe on the rights a victim has under Marsy's Law and Evid.R. 615, including the right to be present during criminal proceedings. We reverse the judgment of the Fifth District Court of Appeals, and we remand the cause to the trial court for a new trial.

Judgment reversed
and cause remanded.

O'CONNOR, C.J., and DONNELLY and BRUNNER, JJ., concur.

KENNEDY, J., dissents, with an opinion joined by DEWINE, J.

FISCHER, J., dissents, with an opinion.

_____

**KENNEDY, J., dissenting.**

{¶ 34} "[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *United States v. Hasting*, 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). In my view, two procedural errors occurred in this trial.

{¶ 35} The alleged victim, A.B., has a constitutional right to remain in the courtroom for all proceedings. *See* Article 1, Section 10a(A)(2) of the Ohio Constitution ("Marsy's Law"). Prior to empaneling the jury, the only open seat in the courtroom was the seat next to the prosecutor at counsel's table. The trial court granted the state's motion to permit A.B. to sit at the prosecutor's counsel table because there was "no other place in the courtroom for her to be during jury selection." Therefore, the trial court did not err when it granted the state's motion to permit A.B. to sit at the prosecutor's counsel table during voir dire.

{¶ 36} But Marsy's Law, R.C. 2930.09, and Evid.R. 615(B)(4) do not authorize the trial court to designate A.B. as the state's representative. That designation is limited to an "officer or employee" of the state. Evid.R. 615(B)(2). Consequently, the trial court's introduction of A.B. as the state's representative at the beginning of jury selection was a trial error.

{¶ 37} The second trial error occurred after the jury was empaneled. Once the trial court released the remaining prospective jurors, they left the courtroom, thereby creating a place other than at the prosecutor's counsel table for A.B. to sit. But the trial court did not revisit its limited order allowing A.B. to sit at the prosecutor's counsel table during jury selection, and Montgomery did not renew his objection. Because these two trial errors, when reviewed either individually or cumulatively, do not constitute structural or plain error but are instead harmless, I would affirm the judgment of the court of appeals. Therefore, I dissent.

**Facts and Procedural History**

{¶ 38} The majority determines that structural error exists in this case because it is too difficult to gauge prejudice. But the majority's discussion of the case-in-chief and the defense is limited to a single sentence: "Following a three-day trial, the jury found Montgomery guilty of kidnapping and rape." Majority opinion, ¶ 5. When reviewing the trial as a whole, it is evident that Montgomery was not prejudiced by the trial errors at issue. Here is a more detailed summary of the trial proceedings.

*Pretrial Proceedings*

{¶ 39} There were about 47 prospective jurors in the jury pool. Seating in the trial court was limited. To allow the bailiff to address "the chair situation" in the courtroom, the prosecutor and defense counsel presented the trial court with their agreement excusing prospective jurors based on their answers to the jury questionnaire. Reducing the number of prospective jurors permitted the trial court to "squeeze in the right number of chairs for the remaining number [of jurors]."

The prosecutor and defense counsel agreed to excuse three jurors. Without objection, the trial court excused another juror due to illness. The trial court addressed pretrial issues.

{¶ 40} The trial court then addressed the issue of who was sitting at the prosecutor's counsel table. The prosecutor stated that the state intended to designate A.B. as the state's representative. The prosecutor cited Evid.R. 615(B)(3) and (4) in support of the state's intent to designate A.B. as its representative and noted that Article I, Section 10a of the Ohio Constitution and R.C. 2930.09 gave A.B. the right to be present any time that the defendant was present during the proceedings. Thereafter, the prosecutor advised the court that A.B. would be called as the state's first witness to reduce any prejudicial effect to Montgomery.

{¶ 41} Montgomery objected to referring to A.B. as the state's representative because she was the alleged victim and had "no affiliation with the State of Ohio in any capacity." And while Montgomery agreed that A.B. could sit in the courtroom, he argued that seating her at "counsel table would be prejudicial" to him.

{¶ 42} The trial court asserted that it was a "new era" in Ohio with the enactment of Marsy's Law and R.C. 2930.09. The trial court then stated that "representatives have been designated" and that Marsy's Law gave A.B. the right to be present in the courtroom. The trial court continued, "Certainly, logistically, there's no other place in the courtroom for her to be during jury selection." And given that A.B. would be the state's first witness, the trial court agreed with the state that the "potential for prejudice" was greatly reduced. The trial court granted the state's request, stating, "[F]or purposes of right now, I am going to grant that," but it added that it would review the matter to determine if there was some other concern that the trial court was not contemplating.

{¶ 43} Later, the state moved for separation of witnesses at trial. The court granted the motion, adding, "And to the extent that your designated representative

is exempted from that, I will grant it in relation to the other witnesses. And, again, pursuant to my revisiting this, as I have an opportunity once we have selected the jury." After addressing other procedural matters, the trial court summoned the prospective jurors into the courtroom.

*Voir Dire Examination*

{¶ 44} The trial court discussed preliminary matters with the prospective jurors and introduced everyone in the courtroom. After introducing the Stark County prosecutor as counsel for the state, A.B. was introduced as the state's representative. The trial court then introduced the other trial participants to the prospective jurors and provided a brief explanation of the established procedural rules that the participants were required to follow. Questioning was completed, the jurors who were hearing the case were chosen, and the remaining prospective jurors were released by the trial court. The jury was empaneled.

{¶ 45} The prospective jurors released from jury service cleared the courtroom, thereby providing ample room for A.B. to sit somewhere other than at the prosecutor's counsel table for the duration of the trial. However, Montgomery did not renew his objection, and the trial court did not revisit Montgomery's original objection. Montgomery points to no other instance besides when A.B. was introduced to the prospective jury pool that she was referred to as the state's representative. During the trial, the judge, the prosecutor, and the testifying detective referred to A.B. as the "victim."

*Preliminary Instructions*

{¶ 46} After the jury was empaneled, the trial court gave some preliminary instructions. The trial court outlined the duties of the trial participants, including those of the jury. The trial court advised the jury that Montgomery was presumed innocent and that the state had the burden to establish his guilt beyond a reasonable doubt. Among other instructions, the trial court also advised the jury on the issue of credibility.

As jurors, you have the sole and exclusive duty to decide the credibility of the witnesses who will testify in this case, which simply means that it is you who must decide whether to believe or disbelieve a particular witness, and how much weight, if any, to give the testimony of each witness.

In determining these questions, you will apply the tests of truthfulness which you apply in your daily lives. These tests include the appearance of each witness upon the stand; his or her manner of testifying; the reasonableness of the testimony; the opportunity he or she had to see, hear and know the things concerning which he or she testified; his or her accuracy of memory; frankness or lack of it; intelligence, interest and bias, if any; together with all the facts and circumstances surrounding the testimony. Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.

You are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or part of the testimony of any witness. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief. The testimony of one witness believed by you is sufficient to prove any fact.

**{¶ 47}** After the judge finished giving these instructions, the state and defense counsel gave opening statements. Despite the trial court's original statement that its ruling on A.B.'s status as representative of the state and her ability to sit at the prosecutor's counsel table was "for now" and the trial court's later statement that it would revisit the issue of A.B.'s not being subject to the separation

of witnesses after the jury was empaneled, the trial court did not revisit those issues on the record, and Montgomery did not renew his objection.

*Opening Statements*

**{¶ 48}** The prosecutor told the jury that Montgomery had been charged with one count of kidnapping and one count of rape. He then informed the jurors that they would have a "hard decision" to make at the end of the trial: they would need to decide whether they believed the testimony of A.B. and the physical evidence that corroborated her story. The prosecutor also told the jurors that if they believed A.B., there would be sufficient evidence to find Montgomery guilty of kidnapping and rape.

**{¶ 49}** The prosecutor then stated that he wished that he could tell the jury that A.B. was Mother Teresa, but he could not. He told them that she had not graduated from high school, that she was unmarried with three kids, that she lived in the projects, and that she smoked marijuana. The prosecutor continued, noting that at the time of the kidnapping and rape, she was engaged to a man who was completing a prison sentence for his role in a shooting. The prosecutor asked the jury to examine everything A.B. did and did not do on the day of the kidnapping and rape and to decide, at the end of the trial, whether she was telling the truth. He told the jury that there would be no doubt that A.B. and Montgomery had engaged in sexual intercourse but that the question the jury faced was whether the victim was a "willing participant." He reminded the jury that in the end, "it [would] come down to the judgment of the 12 of [them]" whether A.B. was telling the truth.

**{¶ 50}** Defense counsel told the jury that the allegations against Montgomery were false and that A.B., for her own "selfish agenda," created an "implausible story of kidnapping and rape, fashioned from lies which she told to others." Defense counsel stated that the only evidence that the jury would hear in support of the charges was A.B.'s testimony and that no other evidence supported

A.B.'s accusations of kidnapping and rape. Defense counsel asserted that there was evidence that would show that A.B.'s claims were false and that she was a liar.

*Testimony at Trial*

{¶ 51} The state presented four witnesses: A.B.; Loralee Bidlingmaier, a Sexual-Assault Nursing Examiner ("SANE") from the Mercy Medical Center in Canton; Detective Joseph Mongold of the city of Canton Police Department; and Samuel Troyer of the Ohio Bureau of Criminal Investigation ("BCI").

{¶ 52} Montgomery is the brother of A.B.'s father's wife and lived in A.B.'s father's basement. A.B. testified that in the fall of 2017, Montgomery began spending time with her at her home. She stated that she just wanted to be friends with Montgomery. One reason given by A.B. for just staying friends was that his sister was married to her dad. At that time, A.B. had a boyfriend who was incarcerated but who was to be released from prison in 2018. She testified that each referred to the other as "fiancé." Nonetheless, Montgomery pursued a romantic relationship and gave the victim rides to work, money, and marijuana.

{¶ 53} In December 2017, A.B. discovered that Montgomery had created a fake Facebook page in her boyfriend's name and that he had threatened to tell her boyfriend that she was having sex with him and with other people. A.B. testified that she then stopped texting Montgomery or spending time with him.

{¶ 54} A.B. testified that on March 15, 2018, she spent the night at her father's house. The next morning, her father and his family left early to go to Florida, leaving A.B. alone in the house with Montgomery. She said that she woke up when Montgomery "literally barged in the room * * * yelling, 'What the F are you here for, why are you here?' " He then punched her in the mouth as she tried to get up. She testified that her nose "was bleeding a little bit" near her nose ring, which was hanging out. Montgomery allowed her to use the bathroom, but he stood in the doorway. He then took her to the basement, where he went through her phone, declined incoming calls, threatened her with "punishment," and forced her

23

to clean the dog kennel. He then took her upstairs to the bathroom and had vaginal intercourse with her in the shower before carrying her to a couch in the room where she had slept and began having sex with her a second time. She testified that she was crying and that he asked her if she wanted him to stop and she said yes. He stopped. He gave her a towel, washed her clothes, cooked her a meal, apologized, and then released her later that day. A.B. drove to her sister's house; the two women then drove to an uncle's house, where the sister dialed 9-1-1 and A.B. reported the rape. Her sister then dropped A.B. at the hospital, where A.B. had a sexual-assault examination and gave a statement to police.

{¶ 55} On cross-examination, defense counsel attempted to impeach A.B. and questioned her at length regarding how Montgomery had punched her; her text messages, emails, and interactions with Montgomery in November 2017, four months before the rape; and her anger at him in December 2017 for creating a fake Facebook account in her boyfriend's name and threatening to tell her boyfriend she was having sex with Montgomery and other people. Defense counsel also challenged discrepancies between her testimony and her statement to police as well as what she did between leaving her father's house and going to her sister's home.

{¶ 56} Bidlingmaier testified that A.B. came to the hospital reporting that she had been sexually assaulted. The nurse testified that A.B. was "very upset [and] very tearful" and was wringing her hands. A.B. reported to the nurse that she had been punched in the face and had pain on the right side of her face and a throbbing headache. Bidlingmaier stated that A.B. had a ruptured vessel in the white part of her eye, a laceration on her lip, and a red mark on her neck. A vaginal examination was performed and swabs were taken for the collection of medical evidence. The collection kit was given to police.

{¶ 57} Detective Mongold responded to the Mercy Medical Center and spoke with A.B. while she was being treated for her injuries. The detective testified

that "[s]he appeared to have some injuries to her face" and that she was crying and upset while they spoke.

**{¶ 58}** A.B. told the detective that the assault had occurred at her father's residence. The detective obtained consent from A.B.'s father to enter his house. Detective Mongold, with a detective from the Crime Scene Unit, searched a first-floor bedroom in the back of the house and a bathroom. In the bathroom trash can, the detectives found a tissue with "possible blood," which was photographed and secured as evidence. The discovery of the tissue was consistent with information that the police had received that A.B. had used a tissue to clean herself off on the day of the sexual assault.

**{¶ 59}** The detective testified that during the investigation, he acquired a DNA swab from Montgomery. After the collection of the DNA sample, it was sealed and secured pursuant to departmental policies and submitted as evidence.

**{¶ 60}** Troyer was employed in a BCI laboratory. He testified that DNA on the swab taken from Montgomery was consistent with DNA from swabs taken from A.B. at the hospital.

**{¶ 61}** With the admission of the state's evidence, the state rested.

**{¶ 62}** The defense called five witnesses: A.B.'s sister, N.J.; A.B.'s father; A.B.'s paternal grandmother; A.B.'s paternal grandfather; and J.G., who sometimes lived in a van parked in front of A.B.'s father's house.

**{¶ 63}** N.J. testified that in the mid-evening hours of the day of the sexual assault, A.B. called her and "was crying, sobbing," and incomprehensible. N.J. said that she met A.B. outside of N.J.'s home and A.B. was scared and shaking. N.J. told her sister to calm down, but "she seemed really scared." Eventually, A.B. told her that Montgomery "punched her out her sleep" and forced her to have sex. N.J. testified that she panicked, called her father in Florida, and "told him that [Montgomery] punched [A.B.] and that he forced his self on her." N.J. said that she and A.B. drove to their uncle's house and then called the police. N.J. described

the 9-1-1 call: "[A.B.] was * * * sobbing and stuff like that so still kind of couldn't really understand.  But as much as I remember, she told them that she had been raped, assaulted, and she gave them * * * Theo Montgomery's name and told them to meet her at Mercy [Hospital]."  N.J. then drove A.B. to Mercy.

**{¶ 64}** A.B.'s father testified that he believed that Montgomery and A.B. were "seeing each other here and there" and "shooting it regular, doing it."  Montgomery would text A.B.'s father before Montgomery would visit A.B. at her home.  A.B.'s father also testified that when he initially spoke to A.B., she was crying and said Montgomery had punched her but she did not say that she had been raped.  After speaking to Montgomery, he called A.B. and asked, "Tell me the truth, did you guys have sex?  * * * She said, Yeah.  After he punched me, that's when he jumped on top of me."

**{¶ 65}** A.B.'s grandmother testified that she received a call from A.B. during the evening hours the day of the sexual assault and that A.B. "sounded like something was wrong."  She testified, "[S]he said Theo something, but she was a little excited and she didn't get into what went on.  Then the next thing she gave the phone to her sister [N.J.]."  In response to that call, she and her husband went to their son's home.  They entered the home, but nothing appeared to be out of place.

**{¶ 66}** A.B.'s grandmother testified that she and her husband met the detective at their son's house the next day.  She said that she was certain that there was no blood on the floor in the television room or the hallway leading back to the family room.  She said that she did see a tissue with blood on it in the bathroom trash can.

**{¶ 67}** A.B.'s grandfather also testified.  He testified that he did not talk to A.B. when she called his wife.  After his wife got off the phone, she told him they needed to go to A.B.'s father's house because something had happened to A.B.  He told her he was "not going nowhere because [he] knew how [his] granddaughter

[was]." He testified that he also got a phone call from his son, who asked him to go to the house to meet police.

{¶ 68} He said that he and his wife went to A.B.'s father's home, entered, and waited for police. The house was not in disarray, and there was no blood anywhere. He allowed the detective access to two areas, a first-floor bedroom, which he called a TV room, and the bathroom. When the detective attempted to go downstairs to the basement, A.B.'s grandfather told him, "No, you can't go down in the basement." According to A.B.'s grandfather, the detective said that Montgomery lived in the basement and he needed to go downstairs. A.B.'s grandfather told the detective, "I'm not going to stand here and argue with you about going downstairs."

{¶ 69} A.B.'s grandfather testified that his son returned home the next day, and A.B.'s grandfather went back to his son's house. While he was there, his granddaughters came to the house. He said that he looked at A.B. "real closely" and asked her where the "marks" on her face were, thinking that "if all of this happened," she would have had more visible injuries.

{¶ 70} J.G. was the final witness for the defense. He testified that he saw A.B. and Montgomery walk peacefully out of the house after the sexual assault and that he did not see any injuries on her face. He said that he was about 15 to 20 feet away from the two when they left the house.

{¶ 71} With the admission of the defendant's exhibits, the defense rested.

*Jury Instructions*

{¶ 72} The trial court then proceeded to give jury instructions, first restating that the defendant was presumed innocent and that the state had the burden to prove that the defendant was guilty beyond a reasonable doubt. On the issue of credibility, the trial court repeated the preliminary instructions that were given when the jury was empaneled and then added:

You should not decide any issue of fact merely on the basis of the number of witnesses who testify on each side of the issue. Rather, the final test in judging evidence should be the force and weight of the evidence, regardless of the number of witnesses on each side of an issue.

A discrepancy in a witness' testimony or between his or her testimony and that of another, if there are any, does not necessarily mean you should disbelieve the witness, as people commonly forget facts or recollect them erroneously after the passage of time. You are certainly all aware of the fact that two persons who are witnesses to an incident may often see or hear it differently. In considering a discrepancy in a witness' testimony, you should consider whether such discrepancy concerns an important fact or a trivial one.

If you conclude that a witness has willfully lied in his testimony as to a material fact, you may distrust all of his or her testimony, and you would then have the right to reject all of his or her testimony unless, after all the testimony, you believe that the probability of truth favors his or her testimony in other particulars."

*Closing Arguments*

{¶ 73} The prosecutor reminded the jurors that at the beginning of the trial, he told them that they would hear from A.B. and that they would have to decide whether they found her testimony credible. He asserted that if they did find her testimony credible, every element of the crimes of kidnapping and rape had been established. He argued that more than just A.B.'s testimony established the elements of the crimes: the testimony of the SANE that the injuries on A.B.'s face were consistent with being punched in the face and Mongold's testimony that he found a tissue right where A.B. said it would be provided corroborating evidence.

{¶ 74} Defense counsel argued that A.B.'s accusations were false and unsupported by any corroborating evidence. Defense counsel also pointed out that the jury had heard evidence exposing A.B.'s "falsehoods and lies." Defense counsel, relying on numerous nonsexual text messages between A.B. and Montgomery over a two-day period in early November 2017, more than four months before the rape, contended that the two had had a consensual sexual relationship. Counsel suggested that A.B. had fabricated the rape because she was angry about Montgomery making the fake Facebook account in December and then threatening to tell her boyfriend she was having sex with other people. And defense counsel asserted that she faked her own injuries by hitting herself in the mouth while driving away from her father's house after the alleged rape.

{¶ 75} The jury found Montgomery guilty of kidnapping and rape but acquitted him of the sexual-motivation specification attached to the kidnapping count. The trial court found him guilty of the repeat-violent-offender specification and imposed an aggregate ten-year sentence. The court of appeals affirmed the convictions.

{¶ 76} This court accepted Montgomery's appeal. Montgomery argued in one proposition of law that he had been denied his right to a fair trial, because A.B. was allowed to be designated as the state's representative and sit at the prosecutor's table throughout the trial. To overturn Montgomery's conviction and remand the matter for a new trial, this court must find that these errors, either individually or cumulatively, denied Montgomery of a right to a fair trial. In my view, they did not.

**Law and Analysis**

*Plain, Harmless, and Structural Error*

{¶ 77} " 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a

tribunal having jurisdiction to determine it.' " *United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), quoting *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944). When a defendant forfeits the right to assert an error on appeal, an appellate court applies a plain-error standard of review. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 21-22. Under this standard, the defendant bears the burden of "showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. An appellate court has discretion to notice plain error and therefore "is not required to correct it." *Rogers* at ¶ 23.

{¶ 78} In contrast, when a defendant objects to an error at trial, an appellate court applies a harmless-error standard of review. *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15. Under the harmless-error standard, the state "bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." *Id.* As with plain error, "[w]hether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial," *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 18. But "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). An appellate court is required to reverse a conviction when the state is unable to meet its burden. *Perry* at ¶ 15.

{¶ 79} "We have recognized that when a defendant is represented by counsel and tried by an impartial fact-finder, there is a strong presumption that all errors—constitutional and nonconstitutional—are subject to harmless-error review." *Jones* at ¶ 19. Nonetheless, the United States Supreme Court and this court have held that certain errors cannot be deemed harmless. *E.g., Weaver v.*

*Massachusetts*, ___ U.S. ___, ___, 137 S.Ct. 1899, 1907-1908, 198 L.Ed.2d 420 (2017); *Perry* at ¶ 17.

{¶ 80} Structural errors are "constitutional defects that ' "defy analysis by 'harmless error' standards" because they "affect[] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself." ' " (Brackets added in *Fischer*.) *Perry* at ¶ 17, quoting *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9, quoting *Arizona v. Fulminante*, 499 U.S. 279, 309, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Structural error is traditionally approached categorically, and, as such, it is not susceptible to harmless-error review no matter the facts of the case. *Neder v. United States*, 527 U.S. 1, 14, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *Jones* at ¶ 2, 20. "Despite its name, the term 'structural error' carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.' " *Weaver* at ___, 137 S.Ct. at 1910, quoting *Chapman* at 24.

{¶ 81} Structural error has been recognized only in limited circumstances involving fundamental constitutional rights, including the denial of counsel to an indigent defendant, the denial of counsel of choice, the denial of self-representation at trial, the denial of a public trial, and the failure to instruct the jury that the accused's guilt must be proved beyond a reasonable doubt. *Id.* at ___, 137 S.Ct. at 1908; *United States v. Davila*, 569 U.S. 597, 611, 133 S.Ct. 2139, 186 L.Ed.2d 139 (2013). Structural error is " 'highly exceptional.' " *Greer v. United States*, ___ U.S. ___, ___, 141 S.Ct. 2090, 2100, 210 L.Ed.2d 121 (2021), quoting *United States v. Davila*, 569 U.S. 597, 611, 133 S.Ct. 2139, 186 L.Ed.2d 139 (2013).

{¶ 82} The Supreme Court has explained that "a constitutional error is either structural or it is not." *Neder* at 14. Under this "traditional categorical approach to structural errors," *id.*, once a constitutional error is recognized as structural, it is a structural error in all cases, regardless of the facts of a specific case

or the amount of evidence against the accused, *id.* (rejecting "a case-by-case approach that is more consistent with our traditional harmless-error inquiry"). When a preserved structural error is shown, a conviction is reversed even when the evidence of guilt is overwhelming. *See United States v. Dominguez Benitez*, 542 U.S. 74, 84, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004), fn. 10; *United States v. Trujillo*, 960 F.3d 1196, 1201 (10th Cir.2020).

**{¶ 83}** The denial of an accused's Sixth Amendment right to an impartial jury is structural error and is not subject to harmless-error review. *Rivera v. Illinois*, 556 U.S. 148, 161, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009), citing *Gomez v. United States*, 490 U.S. 858, 876, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989). An impartial jury consists of "jurors who will conscientiously apply the law and find the facts," *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and "render a verdict based on the evidence presented in court," *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). A juror exhibits partiality, for example, if he or she expresses fixed opinions of the defendant's guilt based on pretrial publicity, *id.* at 727-728, or has a close familial relationship with a party or some other personal interest in the outcome of the trial, *United States v. Torres*, 128 F.3d 38, 45 (2d Cir.1997). *See also Hall v. Banc One Mgt. Corp.*, 114 Ohio St.3d 484, 2007-Ohio-4640, 873 N.E.2d 290, ¶ 28 (noting circumstances that disqualify a jury); R.C. 2313.17 (setting forth challenges for cause).

**{¶ 84}** So, when an accused is represented by counsel and tried by an impartial judge and jury, it is presumed that all other constitutional errors may be found harmless beyond a reasonable doubt. *Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, at ¶ 19. Montgomery does not argue that the trial judge or any of the jurors who sat on the panel were biased against him, either presumptively or in fact. Rather, Montgomery suggests that structural error occurred when the trial court permitted A.B. to sit at the prosecutor's counsel table as the state's representative. However, he fails to develop that argument beyond the mere

assertion that "[g]iven the weighty Constitutional issues at stake, this Court could find structural error when an alleged victim sits at counsel table." The question whether the trial court committed structural error therefore is not properly before this court. It has not been sufficiently presented and briefed, and we should not address it in the first instance. *See Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, at ¶ 20. Nevertheless, the majority does so and in doing so issues a decision that is unprecedented.

**{¶ 85}** Montgomery's core argument is that the trial court violated his right to a fair trial because the prosecutor impermissibly vouched for the victim's credibility. As the Seventh Circuit Court of Appeals has explained, "a prosecutor may not vouch personally for the credibility of a witness because it 'threatens to undermine the jury's role as independent factfinder[ ] * * * by placing the prestige of the government behind the witness.' * * * The same threat arises if the Government places the prestige of the court behind the witness." (Brackets and first ellipsis sic.) *United States v. Jackson*, 898 F.3d 760, 765 (7th Cir.2018), quoting *United States v. Renteria*, 106 F.3d 765, 767 (7th Cir.1997).

**{¶ 86}** Impermissible vouching, either explicit or implicit, by a prosecutor may implicate the Sixth Amendment right to an impartial jury. *See United States v. Lopez*, 590 F.3d 1238, 1255-1256 (11th Cir.2009). However, impermissible vouching does not rise to the level of structural error. Instead, the United States Supreme Court has explained that a reviewing court may reverse a conviction based on an error in failing to address the prosecutor's improper vouching "only after concluding that the error was not harmless." *United States v. Young*, 470 U.S. 1, 13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), fn. 10. *Young* remains good law. *See, e.g.*, *United States v. Gonzalez*, 905 F.3d 165, 202 (3d Cir.2018); *United States v. Farmer*, 770 F.3d 1363, 1369 (10th Cir.2014); *Woodfox v. Cain*, 609 F.3d 774, 805 (5th Cir.2010). Moreover, federal courts recognize that vouching is generally not a constitutional error. *E.g., United States v. Lee*, 612 F.3d 170, 195 (3d Cir.2010),

fn. 30*; United States v. Harlow*, 444 F.3d 1255, 1266 (10th Cir.2006). And the existence of a constitutional error is a prerequisite for recognizing structural error, as we recently explained in *Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, at ¶ 22.

**{¶ 87}** The majority, however, carries Montgomery's structural-error argument a step forward, asserting that "[t]he Fourteenth Amendment provides added protection for a fair trial in its equal-protection and due-process clauses." Majority opinion at ¶ 8. But the Supreme Court has explained that "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990). And it has therefore rejected the view that the Fourteenth Amendment affords greater protection of any right that is expressly enumerated in the Bill of Rights. *E.g.*, *Sattazahn v. Pennsylvania*, 537 U.S. 101, 116, 123 S.Ct. 732, 742, 154 L.Ed.2d 588 (2003) ("We decline petitioner's invitation to hold that the Due Process Clause provides greater double-jeopardy protection than does the Double Jeopardy Clause"); *Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ("the Due Process Clause affords [a prison inmate] no greater protection than does the Cruel and Unusual Punishments Clause"). Rather, "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires." *Timbs v. Indiana*, ___ U.S. ___, ___, 139 S.Ct. 682, 687, 203 L.Ed.2d 11 (2019).

**{¶ 88}** The majority points to language in *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), that states that in implementing the presumption of innocence, "courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." While I do not disagree with this statement, as far as it goes, the facts of *Estelle* are distinguishable from

this case. *Estelle* involved an accused who appeared at trial in jail clothes. The court held that although the accused could not be compelled to go to trial in jail clothes because it could impair the presumption of innocence, the accused could nonetheless forfeit any error by failing to object. *Id*. at 512-513. The existence of "factors that may undermine the fairness of the fact-finding process," *id*. at 503, did not create per se reversible error, *id.* at 504.

{¶ 89} In a similar vein, the Supreme Court more recently recognized that "[v]isible shackling [of the accused] undermines the presumption of innocence and the related fairness of the factfinding process." *Deck v. Missouri*, 544 U.S. 622, 630, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). But even though the court regarded the practice as inherently prejudicial, it nonetheless applied harmless-error review, expressly holding that "[t]he State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.' " (First brackets added; second brackets added in *Deck*.) *Id*. at 635, quoting *Chapman*, 386 U.S. at 24, 87 S.Ct. 824, 17 L.Ed.2d 705. Appearing in shackles has at least the same impact on jurors as seating the victim at the prosecutor's counsel table as the state's representative, yet the court declined to treat the shackling error as automatically requiring reversal.

{¶ 90} Moreover, the majority's structural-error analysis is not consistent with any of the three rationales for recognizing structural error articulated by the Supreme Court in *Weaver*. The first rationale is that "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Weaver*, ___ U.S. at ___, 137 S.Ct. at 1908, 198 L.Ed.2d 420. That rationale does not apply, because the majority's new rule is expressly aimed at the reliability of the trial for determining guilt. The majority points to no other weighty constitutional interest in play here.

{¶ 91} The second rationale is that "the effects of the error are simply too hard to measure" and "the government will, as a result, find it almost impossible to

show that the error was 'harmless beyond a reasonable doubt.' " *Id*., quoting *Chapman* at 24. The majority asserts that this rationale applies, but it gives no reason beyond its own unsupported assertion. There is a difference between it being difficult for the state to prove the error harmless *in a particular case* and it being almost impossible to prove the error harmless *in all cases* involving the same error, as is required for structural error.

{¶ 92} As was his right, Montgomery did not testify. Therefore, A.B.'s version of the kidnapping and rape is the only version that the jury heard. As set forth above, the jury heard the testimony of other witnesses—including professionals who interacted with A.B. after the kidnapping and rape—who supported A.B.'s credibility because their testimony corroborated her testimony. None of the defense witnesses were in the father's home at the time of the kidnapping and rape, and none testified as to the reliability of a different account of what had happened. The only testimony that they could give was their assertions that they did not believe A.B.'s story. But by law, the determination of credibility rested within the sole exclusive discretion of the trier of fact, the jury.

{¶ 93} Seating A.B. at the prosecutor's counsel table as the state's representative is not *categorically* prejudicial. It is not difficult to imagine circumstances in which the evidence of guilt could be so overwhelming that the state could prove this type of error harmless, such as when the accused confesses to the offense or there is additional evidence of guilt such as a video recording. And because it is possible to conclude that the error is either harmless or is not, it is not categorically structural error.

{¶ 94} The last rationale for the structural-error rule is that "the error always results in fundamental unfairness." *Id*. Tellingly, the majority musters no authority or analysis showing that allowing A.B. to sit at the prosecutor's counsel table as the state's representative is structural error because it will " '*necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or

innocence.' " (Emphasis added in *Neder*.) *Greer*, ___ U.S. at ___, 141 S.Ct. at 2100, 210 L.Ed.2d 121, quoting *Neder*, 527 U.S. at 9, 119 S.Ct. 1827, 144 L.Ed.2d 35. Nor can it. A one-time comment that A.B. was the state's representative prior to voir dire, followed by allowing the victim to sit at the prosecutor's counsel table throughout the trial, does not " 'deprive defendants of "basic protections" without which "a criminal [proceeding] cannot reliably serve its function as a vehicle for determination of guilt or innocence." ' " (Brackets added in *Greer*.) *Id.*, quoting *Neder* at 8-9, quoting *Rose v. Clark*, 478 U.S. 570, 577-578, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

{¶ 95} There is simply no rationale for the majority's holding that A.B.'s presence at the prosecutor's counsel table and introduction during voir dire as the state's representative constituted structural error. And other state courts that have found error in cases in which victims, or victims' family members, were seated at counsel table have not held that the error was structural. In those other states, the courts considered whether the trial court had erred in its interpretation of a rule or constitutional provision relating to victims' rights or courtroom conduct and then determined whether the error was prejudicial. In *Mask v. State*, 314 Ark. 25, 869 S.W.2d 1, 2 (1993), for instance, the Arkansas Supreme Court determined that the trial court had misinterpreted Ark.R.Evid. 616, which states that the victim of a crime has the right to be present during any hearing. The court held that the rule did not give the victim the right to sit at counsel table with the prosecutor. The court then determined whether the defendant was prejudiced by the error. The court held that the trial court's treatment of witnesses was, in effect, commenting on the evidence. The court also looked to the defendant's maximum sentences as an element of prejudice.

{¶ 96} In *Fuselier v. State*, 468 So.2d 45, 47 (Miss.1985), the Mississippi Supreme Court reversed the defendant's conviction when it determined that "a substantial number of errors occurred during his trial." One of those errors was the

presence of the victim's daughter within the rail near the prosecutor's counsel table during the trial, which the court found inconsistent with Rule 501 of the Mississippi Uniform Criminal Rules of Circuit Court Practice and that "it constituted an inflammatory and prejudicial element." *Id.* at 53. But in reversing the conviction, the court did not find that the error was structural and accorded no greater weight to the error than the other trial errors it determined had occurred.

**{¶ 97}** In its one-paragraph decision in *Walker v. State*, 132 Ga.App. 476, 208 S.E.2d 350 (1974), an intermediate appellate court held that the trial judge had abused his discretion in allowing the mother of the deceased victim of the crime to sit at the table of the prosecution. The court did not find structural error but rather held that the presence of the mother "during the trial of one accused of murdering her son surely must have had an impact on the jury and we cannot say it was not harmful and prejudicial to the defendant's right to have a fair trial." *Id*.

**{¶ 98}** Finally, in *Hall v. State*, 579 So.2d 329, 330 (Fla.App.1991), a Florida court of appeals found reversible error in the prosecution's use of a peremptory challenge of jurors and in its interpretation of Article I, Section 16(b) of the Florida Constitution, which addresses victims' rights. The court held that the provision did not permit victims or their families to "actively participate in the conduct of the trial by sitting at counsel table or being introduced to the jury." *Hall* at 331. But the court made no mention of structural error.

**{¶ 99}** The courts in these cases essentially performed harmless-error analysis. "Harmless-error analysis * * * presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury." *Clark*, 478 U.S. at 578, 106 S.Ct. 3101, 92 L.Ed.2d 460. Here, Montgomery was represented by counsel. There is no indication that either the judge or the jury harbored any bias against him, and the judge instructed the jury that Montgomery is presumed innocent and that the state must prove guilt beyond a reasonable doubt.

**{¶ 100}** Moreover, contrary to the majority's determination, this case is highly distinguishable from *State v. Lane*, 60 Ohio St.2d 112, 397 N.E.2d 1338 (1979). In *Lane*, this court held that conducting a criminal trial within a maximum-security penitentiary for a crime that had been committed in the penitentiary is fundamentally unfair. *Id*. at 117-119. Such a trial, we explained, denies the accused of the fundamental right to a public trial, *id*. at paragraph two of the syllabus, and inherently erodes the impartiality of the juror and the accused's right to compulsory process, *id*. at 117-119. Introducing A.B. once as the state's representative during voir dire and permitting her to sit at the prosecutor's counsel table for the duration of the trial pales in comparison.

**{¶ 101}** I agree that as a general proposition of law, it is error for the trial court to seat the victim at the prosecutor's counsel table as the state's representative during the criminal trial, but I do not believe that the error implicates any of those basic trial rights that are not susceptible to harmless-error review if they are denied. *See United States v. Valencia-Riascos*, 696 F.3d 938, 942 (9th Cir.2012) (applying harmless-error review to order allowing a victim, a law-enforcement officer, to sit at counsel's table as the representative of the government); *United States v. Charles*, 456 F.3d 249, 258-259 (1st Cir.2006) (same); *Hatfield v. Commonwealth*, 250 S.W.3d 590, 595 (Ky.2008) (error in allowing a victim's grandfather to remain at the prosecutor's table is subject to harmless-error review); *Hernandez v. State*, 716 N.E.2d 948, 951 (Ind.1999) (trial court did not err in allowing the victim to sit at the prosecutor's table as an essential witness).

**{¶ 102}** Therefore, I disagree with the second dissenting opinion's position that there is a common-law rule that allows the state to designate the victim as the state's representative and to have the victim sit with the prosecutor at counsel table for the duration of the trial. The Second District Court of Appeals, in *State v. Bryant*, 105 Ohio App. 452, 454, 152 N.E.2d 678 (2d Dist.1957), stated that "[i]t was the province of the prosecuting attorney to make the choice of the person to

assist him in the development of the case for the state." However, a single intermediate-appellate-court decision from the 1950s is too thin a reed to support the existence of a common-law rule. Even if any common-law rule did once exist that allowed the state to seat the victim at the prosecutor's counsel table and to designate the victim as the state's representative in a criminal case, that rule has since been abrogated. R.C. 2930.09 and Evid.R. 615(B)(4) permit the victim to be present during a trial of the assailant unless the exclusion of the victim is necessary to protect the accused's right to a fair trial. Yet neither the plain language of the statute nor the rule permits the victim to sit at the prosecutor's counsel table. And although Evid.R. 615(B)(3) might contemplate the victim's sitting at the prosecutor's counsel table to assist the prosecutor in presenting the case, the prosecutor lacks the total discretion that the appellate court in *Bryant* suggested exists. Instead, Evid.R. 615(B)(3) applies only to those witnesses who are shown to be *essential* to the presentation of the case. The state did not make that showing here.

{¶ 103} Lastly, while Marsy's Law permits the victim of a crime to remain in the courtroom for all proceedings, the plain language of the provision does not afford the victim the right to sit at the prosecutor's counsel table during the criminal trial or to be designated the state's representative. *See* Article 1, Section 10a(A)(2) of the Ohio Constitution.

{¶ 104} Because Montgomery objected to the prosecutor's introduction of A.B. as the state's representative before voir dire, harmless-error review applies to that error. And regardless of whether we conceptualize the error in this case as involving constitutional or nonconstitutional rights, our review is essentially the same: Has the state demonstrated that the error was harmless beyond a reasonable doubt? *See Chapman*, 386 U.S. at 24, 87 S.Ct. 824, 17 L.Ed.2d 705; *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 63. *But see State*

*v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 55-75 (Kennedy, J., dissenting).

**{¶ 105}** The judge's ruling on the issue of A.B. sitting at the prosecutor's counsel table was not definitive at the time she made it. Montgomery did not renew his objection at any point during the trial after the jury was empaneled. His failure to renew his objection means that the issue of A.B.'s presence at the prosecutor's counsel table should be reviewed under a plain-error standard. Even so, because the error was so inconsequential in the context of the entire trial, it is harmless beyond a reasonable doubt.

*Harmless-error review*

**{¶ 106}** Although there is no bright-line rule to determine whether the prosecutor's explicit or implicit vouching affected the outcome of the trial, the United States Court of Appeals for the Ninth Circuit has developed a multifactor test that is useful in gauging prejudice to the accused. Those factors include

> "the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall."

*United States v. Ruiz*, 710 F.3d 1077, 1085 (9th Cir.2013), quoting *United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir.1993).

**{¶ 107}** It is arguable whether the trial court erred when it permitted A.B. to sit at the prosecutor's counsel table during voir dire. It is undisputed that A.B.

had a right to be present in the courtroom at every stage of the criminal trial. The judge stated that the seat at the prosecutor's counsel table was the only seat available for A.B. during voir dire. Regardless, the trial court did err in introducing A.B. as the state's representative. At the time of the trial court's initial ruling, and later when the state sought a separation of witnesses, the trial court indicated that it would revisit the issue of where A.B. was seated, but it did not, and Montgomery failed to renew his objection after the jury was impaneled. A.B. was the first witness called, so there is no concern that she relied on the testimony of other witnesses when she testified.

{¶ 108} In regard to the *Ruiz* factors, the trial court introduced A.B. as the state's representative once during the opening moments of voir dire. Further, any vouching was implicit, not explicit. The prosecutor did not make any express comment staking his professional position or reputation on A.B.'s credibility. Nor did he express any personal opinion about her truthfulness. Rather, the victim was simply introduced, and for all that the record shows, she sat quietly at the prosecutor's counsel table. Therefore, one can only speculate that a juror would take that to mean that A.B. should be believed because the state said so; any connection between A.B.'s believability and introducing her as the state's representative and seating her at the prosecutor's counsel table is tenuous at best. Moreover, the prosecutor did not imply that he had extrinsic evidence of A.B.'s credibility or that the state and the trial court would be monitoring her veracity during the trial.

{¶ 109} The limited nature of any implicit vouching had no substantial effect on the outcome of the trial. A.B.'s testimony was important. She testified that she did not consent to having sex with Montgomery. But that was not the only proof in the case. The state presented evidence corroborating her testimony that he had assaulted her, including other witnesses' testimony, recorded cellphone calls, and pictures of her cut lip and other bodily injuries as well as the tissue found in

her father's bathroom. Multiple witnesses described A.B. as sobbing and emotionally upset after she left Montgomery's residence. This evidence is sufficient to prove Montgomery's guilt beyond a reasonable doubt.

{¶ 110} Lastly, the defense did attack A.B.'s credibility. It contended that Montgomery and A.B. had been having a consensual sexual relationship, relying on numerous nonsexual text messages between them over a two-day period in early November 2017, more than four months before the rape. Defense counsel suggested that A.B. fabricated the rape allegation because in December 2017, three months before the rape, Montgomery had made a fake Facebook account in her boyfriend's name and had threatened to tell her boyfriend she was having sex with Montgomery and other people. He essentially argued that she had consensual sex with Montgomery on March 16, 2018, but that she was still mad enough at him from his actions in December to falsely accuse him of kidnapping and rape. Then, according to defense counsel, she faked her own injuries by hitting herself in the mouth while driving away from her father's house after the rape.

{¶ 111} The defense also relied on the absence of blood throughout the father's house as well as testimony of A.B.'s family members that she did not look injured when they first saw her. However, the police did recover the tissue containing possible blood, and they were refused access to the basement to search for additional evidence. The SANE who examined A.B. after the assault testified that her injuries were consistent with being punched in the mouth and the detective testified that A.B. had injuries on her face. J.G. was the only defense witness to see A.B. between the time she left her father's house and arrived at her sister's residence, and he admitted that he saw her only from 15 to 20 feet away. The defense also relied on A.B.'s father's testimony that he knew she and Montgomery were "doing it," knowledge that was based on Montgomery's texting or calling him when he went over to her home "just in case something happens or whatever." Yet her father did not know what day these communications occurred, and A.B.

admitted that Montgomery had been over to her home in the fall of 2017 but only as a friend. And although the defense pointed to numerous text messages between the two over a two-day period in early November 2017, more than four months before the rape, none of the messages established that they had had a sexual relationship. And even if they were in a relationship, that does not by itself disprove that Montgomery kidnapped and raped A.B. Therefore, not only does the defense theory of the case strain credibility, it is supported by little if any evidence.

{¶ 112} Defense counsel also sought to impeach A.B. based on discrepancies between her testimony and her statement to police and questioned her extensively on why it took approximately 30 minutes for her to drive the short distance from her father's house to her sister's home. But in the end, the jury could reasonably have found that A.B. and her sister were credible and that other witnesses were either mistaken or not credible. And no reasonable juror could believe Montgomery's theory that A.B. engaged in consensual sex but then fabricated the kidnapping and rape charges because of events that had occurred months earlier.

{¶ 113} Therefore, there is simply no reasonable possibility that the trial court's error in introducing her once as the state's representative at the start of voir dire tipped the scales and contributed to Montgomery's convictions. The jurors were instructed multiple times that Montgomery was presumed innocent and that they could not find him guilty unless they found that he had committed the crimes beyond a reasonable doubt. And the jurors were capable of fulfilling that duty, since they acquitted Montgomery of the sexual-motivation specification accompanying the kidnapping charge. Any error is harmless beyond a reasonable doubt.

*Plain-error review*

{¶ 114} Montgomery forfeited any challenge to A.B. remaining seated at the prosecutor's counsel table after the jury was empaneled. After the trial court

overruled his initial objection to the state's request, the trial court said it would reassess the issue before trial. Again, when the state made a request for the separation of witnesses, the court said that it would reassess A.B.'s status regarding witness separation after the jury was empaneled. But the trial court never revisited that issue on the record. Because Montgomery failed to renew his objection, plain-error review applies in assessing that error, and reversal for plain error is appropriate only if the accused demonstrates that but for the error, the outcome of the trial would have been otherwise, *Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, at ¶ 16. It is not possible to conclude that the outcome of the trial would have been different had A.B. been sitting elsewhere in the courtroom, given the depth of the case against Montgomery and the fantastical defense theory. Seating A.B. at the counsel table is a nonfactor, when compared with the importance of the consistency of her testimony, her response to ineffectual cross-examination, and the presence of witnesses who supported A.B.'s version of events by describing their perceptions of her emotional state and physical injuries immediately after the crime. In fact, the error would not meet even the harmless-error standard, since it was harmless beyond a reasonable doubt.

{¶ 115} Although the individual errors standing alone did not deprive Montgomery of a fair trial, this court in *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus, recognized the doctrine of cumulative error. Under this doctrine, a conviction will be reversed when the cumulative effect of the trial errors deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal. *Id*. at 196-197; *see also State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132; *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995).

{¶ 116} However, the doctrine of cumulative error is not applicable in this case, because as set forth above, none of the trial errors committed in this case,

when considered either individually or cumulatively, resulted in prejudice. Montgomery received a fair trial.

**{¶ 117}** Again, the jury was able to consider the credibility of A.B., the SANE, the detective, and A.B.'s family members as well as the defense's theory of the case. They were instructed on the presumption of innocence and the state's burden to prove Montgomery's guilt beyond a reasonable doubt. There is no indication from this record that but for A.B.'s one-time introduction as the state's representative and her remaining seated at the prosecutor's counsel table during the trial that Montgomery would not have been convicted. And even if Montgomery had preserved his objection to the victim's continued presence at the prosecutor's counsel table, there is no reasonable possibility that any error contributed to his convictions.

### Conclusion

**{¶ 118}** Montgomery "is entitled to a fair trial but not a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 97 L.Ed. 593 (1953). There is no indication that either of the trial errors, either individually or cumulatively, affected the outcome of this case. But based on the majority's opinion, anytime an appellate court determines that the prejudicial effect of a trial error is too hard to gauge, the error will rise to the level of structural error. That is far too low a bar for structural error, which the United States Supreme Court has categorized as " 'highly exceptional.' " *Greer*, ___ U.S. at ___, 141 S.Ct. at 2100, 210 L.Ed.2d 121, quoting *Davila*, 569 U.S. at 611, 133 S.Ct. 2139, 186 L.Ed.2d 139. The errors in this case are susceptible to harmless-error review, did not prejudice the substantial rights of the defendant, and did not impinge upon his right to a fair trial under the Sixth Amendment.

**{¶ 119}** For these reasons, I would affirm the judgment of the court of appeals. Because the majority does not, I dissent.

DEWINE, J., concurs in the foregoing opinion.

---

**FISCHER, J., dissenting.**

{¶ 120} The majority opinion concludes that appellant Theodis Montgomery's constitutional right to a fair trial was violated when the trial court permitted the state to designate the victim as its representative and seat her with the prosecutor during trial. The majority opinion determines that this was structural error. Because I believe that there was no error, let alone structural error, I must respectfully dissent.

### The trial court has discretion to permit the state to choose its representative

{¶ 121} In this case, the court must answer whether the prosecutor may request that the victim serve as its representative at a criminal trial and be seated at the prosecutor's table and whether the trial court has the discretion to grant that request. The majority opinion improperly concludes that the state has no right to choose anyone except an employee of the state or a member of law enforcement as its representative to sit at the prosecutor's table and that the trial court erred when it granted the state's request for the victim to serve as its representative. These conclusions are incorrect, because there is no law—constitutional or statutory—prohibiting the state from choosing its representative and the common law supports such a request.

### Marsy's Law does not give the victim the right to sit with the prosecutor at trial

{¶ 122} The majority opinion properly concludes that Marsy's Law, Ohio Constitution, Article I, Section 10a, does not give the victim the right to sit with the prosecutor at trial. The Ohio Constitution specifically provides that all prosecutions are carried on in the name of and by the authority of the state of Ohio. Article IV, Section 20, Ohio Constitution. And under Article I, Section 10a(A)(2) and (9) of the Ohio Constitution, the victim has the right to be present in the courtroom and to confer with the state upon request. Nowhere in Marsy's Law does the victim

have the right to sit with the prosecutor during trial, and we will not construe the Ohio Constitution to provide such a right. When the meaning of a constitutional provision is clear, this court will not look beyond that provision. *Toledo City School Dist. Bd. of Edn. v. State Bd. of Edn.*, 146 Ohio St.3d 356, 2016-Ohio-2806, 56 N.E.3d 950, ¶ 16.

{¶ 123} To conclude that Marsy's Law gives a victim the right to sit with the prosecutor at trial would be to read a right into the Ohio Constitution that does not exist. Such a reading would construe the Constitution in a manner contrary to its plain language. *See Hall v. State*, 579 So.2d 329, 331 (Fla.App.1991) (declining to construe a provision of the Florida Constitution that granted certain rights to victims to permit those victims or their families to actively participate in the trial by sitting at counsel table or being introduced to the jury); *see also L.T. v. State*, 296 So.3d 490, 498 (Fla.App.2020) (because explicit text did not direct a departure from the traditional common-law approach to criminal justice, the court declined to interpret Florida's version of Marsy's Law as implicitly giving a victim a right to demand party status in a juvenile proceeding). Thus, I agree with the conclusion in the majority opinion that Marsy's Law does not apply here.

**Evid.R. 615(B) does not limit the state's ability to request that the victim serve as its representative**

{¶ 124} "Courts have inherent powers derived from common law that assist in exercising their enumerated judicial powers, such as managing their cases and courtrooms." *United States v. Spellissy*, 374 Fed.Appx. 898, 900 (11th Cir.2010); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). These powers are not absolute—they must be exercised with restraint and discretion. *Chambers* at 44. One inherent power of the judiciary is the power to permit the state to choose a representative to be present throughout the proceedings and aid the prosecutor at trial. *See State v. Lewis*, 70 Ohio App.3d 624, 640, 591 N.E.2d 854 (4th Dist.1990) ("The state may choose a representative to be

present throughout the proceedings"). The state may also choose as its representative the victim of the crime, so long as it is not done for an improper purpose. *See State v. Bryant*, 105 Ohio App. 452, 454, 152 N.E.2d 678 (2d Dist.1957); *Hughes v. State*, 126 Tenn. 40, 81-82, 148 S.W. 543 (1912); *State v. Shaw*, 96 Idaho 897, 901, 539 P.2d 250 (1975).

{¶ 125} However, the majority opinion improperly concludes that Evid.R. 615(B)(2) prevents the state from choosing anyone except law enforcement or an employee of the state to serve as its representative and thus concludes that a victim could not serve as the state's representative at trial. At common law, a trial court had discretion regarding the sequestration of witnesses, *see In re Unauthorized Practice of Law in Cuyahoga Cty.*, 175 Ohio St. 149, 154, 192 N.E.2d 54 (1963) (a trial court does not abuse its discretion in regard to sequestration when it excluded a witness who was only technically a party). Evid.R. 615 eliminated that discretion, but the rule did not address the trial court's discretionary authority to permit the state to select its representative at trial. The majority opinion sets forth a tortured reading of the rule; it creates a fictitious boundary that limits the state's ability to choose its representative by concluding that "Evid.R. 615(B)(2) may be viewed as implicitly and logically limiting the state's selection of a representative to a person who is an officer or employee of the state." Majority opinion, ¶ 17.

{¶ 126} The majority opinion opines that under the second exception in Evid.R. 615(B), the prosecutor may select only an employee or officer of the state to serve as its representative at trial. There is absolutely no support for this in the plain language of the rule. Evid.R. 615 deals solely with the separation and exclusion of witnesses. Evid.R. 615(A) requires the exclusion of witnesses in specified circumstances to maintain the integrity of the witnesses' testimony. And Evid.R. 615(B) lists those persons who are exempt from exclusion: (1) a party who is a natural person, (2) an officer or employee of a party that is not a natural person who is designated by that party's attorney, (3) a person whose presence is shown

by a party to be essential to the presentation of the party's cause, and (4) in a criminal proceeding, an alleged victim of the charged offense. No plausible reading of this rule supports or even suggests the idea that this rule limits the state's ability to request a victim to serve as its representative or that the trial court lacks discretion to grant such a request.

{¶ 127} In addition to there being no support for the majority opinion's position in the plain language of the rule, the history of Evid.R. 615 also contradicts the majority opinion's position. As mentioned earlier, at common law and prior to the adoption of the Rules of Evidence, the trial courts had broad discretion to control witness sequestration. *See In re Unauthorized Practice of Law in Cuyahoga Cty.* at 154. That power was limited upon the creation of Fed.R.Evid. 615 and Evid.R. 615. The purpose of both Fed.R.Evid. 615 and Evid.R. 615 is to require a trial court to sequester witnesses as a means to discourage fabrication, inaccuracy, and collusion among witnesses when there has been a request to do so. Fed.R.Evid. 614, 1972 Proposed Rules Advisory Committee's Notes (sequestering witnesses was recognized as a means of discouraging and exposing fabrication, inaccuracy, and collusion); 1980 Staff Note, Evid.R. 615 (Rule 615 is identical to Fed.R.Evid. 615). The exceptions granted in the rules for the sequestration of witnesses are rooted in the understanding that some witnesses should be able to remain in the courtroom to assist in presenting the case. Notes of the Committee on the Judiciary, Sen.Rep. No. 93-1277, at 7072-7073 (1974). The rule allows prosecutors to exempt investigative agents from sequestration orders. 1 Giannelli, Gilligan, Imwinkelrield, Lederer, and Richter, *Courtroom Criminal Evidence*, Section 104 (2020). While the rule may have been written to exclude a witness from sequestration to be a party's representative, the rule does not limit who the state may appoint as its representative or the trial court's discretion to grant that request. Indeed, the drafters of the rule acknowledged that one of the witnesses exempted from sequestration could be the one most helpful to the state. *See* Notes of the

Committee on the Judiciary, Sen.Rep. No. 93-1277, at 7072-7073 (1974). If the state did not have a right to designate an agent, it would be disadvantaged compared to individual litigants. Capra & Richter, *"The" Rule: Modernizing the Potent, but Overlooked, Rule of Witness Sequestration,* 63 Wm. & Mary L.Rev. 1, 48 (2021).

{¶ 128} The majority opinion maintains that it is not the role of the judiciary to enlarge Evid.R. 615(B). I wholly agree. Therefore, I must heartily disagree with the majority opinion's expansive reading of Evid.R. 615(B) and its conclusion that it limits the state's ability to request that the victim serve as its representative at trial.

**The common law supports the state's right to choose its representative**

{¶ 129} The plain language of Marsy's Law and Evid.R. 615 demonstrates that neither of these provisions gives a victim the right to sit with the prosecutor at trial, nor do the provisions give the state the authority to choose its representative. But the lack of a written law authorizing the state to choose its representative does not mean that the state is prohibited from doing so. The majority opinion fails to recognize that the ability of the state to choose a representative and the trial court's discretion to grant that request is well rooted in the common law. When the legislature is silent, a court looks to the common law. *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 447, 123 S.Ct. 1673, 155 L.Ed.2d 615 (2003).

{¶ 130} While the majority opinion cites cases from several states that have rejected the premise that the state can designate the victim as its representative, it fails to recognize that there is support in Ohio that the state may choose anyone, including a deceased victim's wife, to serve as the state's representative so long as the person's presence is not used in an inappropriate manner. *See State v. Bryant*, 105 Ohio App. at 454, 152 N.E.2d 678; *see also Lewis*, 70 Ohio App.3d at 640, 591 N.E.2d 854 ("The state may choose a representative to be present throughout the proceedings"). In *Bryant*, the Second District Court of Appeals stated that it is "the

province of the prosecuting attorney to make the choice of the person to assist him in the development of the case for the state." *Id*. While *Bryant* may be only one example, the majority opinion has pointed to no cases in Ohio in which the opposite conclusion was reached.

{¶ 131} The existence of this common-law rule is supported by the Supreme Court of Tennessee's decision in *Hughes*, 126 Tenn. 40, 148 S.W. 543. In that case, the Tennessee Supreme Court rejected a defendant's argument that it was prejudicial for a widow, whose husband had been killed by the defendant, to remain in the courtroom, sitting beside the attorney general, when the defendant had been acquitted of the crime involving the woman's husband and there was no evidence that the woman was placed by the attorney general for the purpose of influencing the jury. *Id.* at 81-82. And the Idaho Supreme Court held a similar view in *Shaw,* 96 Idaho at 900, 539 P.2d 250. In *Shaw*, the complaining witness was seated at counsel's table with the prosecuting attorney. The court noted that witnesses should not ordinarily be seated at counsel table unless there was a showing that the witness was needed to help counsel, but whether that person was permitted to remain was left to the discretion of the trial court. These cases demonstrate that under the common law, the state may choose the victim to serve as its representative, at the discretion of the trial court.

{¶ 132} The first dissenting opinion maintains that even if a common-law rule existed as identified by *Bryant*, that rule has since been abrogated by R.C. 2930.09 and Evid.R. 615(B)(4). But this conclusion misinterprets the issue. R.C. 2930.09 sets forth a *victim's right* to be present in the courtroom, and Evid.R. 615(B)(4) allows for the victim to be excluded from sequestration orders. Neither rule addresses *the state's ability* to request that the victim serve as *its representative* and the trial court's discretion to grant that request. The victim's rights at trial and the state's rights at trial are two separate things. Simply because the victim is not given the right by rule or statute to sit with the prosecutor does not mean that the

state does not have the right to ask the victim to serve as its representative and to have the victim sit next to the prosecutor at trial.

{¶ 133} The majority opinion holds that permitting the victim to sit with the prosecutor as the state's representative at trial violated Montgomery's right to a fair trial by eroding his presumption of innocence. But the majority opinion does not explain *how* seating the victim with the prosecutor does so, beyond making broad generalizations about fairness. The majority opinion makes a sweeping conclusion that the placement of the victim with the prosecutor somehow turned the prosecutor into the victim's private counsel. This is speculative and is without support.

{¶ 134} We must recognize that there are cases in which trial counsel may need assistance. A court has discretion to determine whether a witness may provide that assistance. *See United States v. Charles*, 456 F.3d 249, 259 (1st Cir.2006). Courts have consistently permitted the state to choose a member of law enforcement, including one who will testify against the defendant, to serve as the state's representative to assist with the prosecution of the case. *See United States v. Martin*, 920 F.2d 393, 397 (6th Cir.1990) (holding that a law-enforcement agent was permitted to remain in the courtroom even when other witnesses were sequestered); *Powell v. United States*, 208 F.2d 618, 619 (6th Cir.1953); *United States v. Wells*, 437 F.2d 1144, 1146 (6th Cir.1971) (FBI agent seated at counsel table to assist a government attorney could testify even though other witnesses were excluded); *State v. Fuller*, 1st Dist. Hamilton No. C-960753, 1997 WL 598404, *1 (a representative of the law-enforcement agency handling a case may remain in the courtroom despite an order to separate witnesses). This is so even when that law-enforcement officer was a victim in the case. *See Charles* at 259. While it may be uncommon for the state to choose a victim who is not a member of law enforcement to serve as its representative, the state may do so under the common law at the discretion of the trial court. An officer who sits with the prosecutor and a victim who sits with the prosecutor present the same challenges. The idea is that the state

may choose a representative who can aid in its prosecution of the case. This is why it is imperative that we recognize this as a decision that lies within the sound discretion of the trial court.

**{¶ 135}** Simply because there is not a written law authorizing or prohibiting the state from selecting its representative does not mean the state may not do so at the trial court's discretion. *See Charles* at 259; *Shaw*, 96 Idaho at 901, 539 P.2d 250. The trial court's decision to permit the state to designate the victim as its representative should be reviewed for an abuse of discretion. " ' "Abuse of discretion" ' * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). Montgomery has not demonstrated that the trial court's decision was unreasonable, arbitrary, or unconscionable.

**{¶ 136}** Here, the prosecutor requested that the victim, A.B., serve as the state's representative and be permitted to sit at the state's counsel table throughout the trial. The request was made pursuant to Evid.R. 615(B)(3) and (4)—the provisions that state that the rule does not authorize the exclusion of (1) a person shown by a party to be essential to the presentation of the case and (2) the alleged victim of the crime. The prosecutor noted that A.B. was the victim and that he intended to call her as his first witness to avoid any issues with regard to prejudicing the defendant. Montgomery objected on the basis that doing so would be prejudicial, but he did not explain how it would do so. The trial court granted the state's motion, relying on the victim's rights set out in Marsy's Law and R.C. Chapter 2930, over Montgomery's objection. While the trial court's reliance on Marsy's Law was error, the common law permits this decision, and the decision was not unreasonable.

**{¶ 137}** The state's choice to have the victim serve as its representative was not for an impermissible purpose but was to aid in its prosecution and to permit her

to participate in the case, as evidenced by its motion under Evid.R. 615(B)(3) and (4). Indeed, the victim was the state's first witness, and it was her account to tell. Additionally, Montgomery's witnesses were the victim's own family members—the victim would certainly be the best person to aid the prosecution in their cross-examination. And there was no evidence that A.B. ever acted improperly during the proceedings. Because A.B. was in the best position to help the state develop its case, the trial court's decision to permit her to serve as the state's representative was not an abuse of discretion.

{¶ 138} Because the majority opinion ignores the common law and twists the rules of evidence to restrict the state's ability to choose a representative, limiting its choice only to law enforcement or a state employee, I must dissent. Rather, I would find that a common-law right exists in Ohio that allows the state to choose its representative at trial at the discretion of the trial court.

### Even if the trial court's decision was error, it does not rise to the level of structural error

{¶ 139} The majority opinion concludes that the trial court's decision granting the state's request to designate the victim as the state's representative and seat her at counsel's table was structural error. As I have expressed above, I do not believe that there was any error in this case. But even assuming arguendo that the trial court did err, the error does not rise to the level of structural error.

{¶ 140} There are two types of constitutional errors that may occur in a criminal proceeding: (1) trial errors and (2) structural errors. *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9. A trial error is an " 'error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented to determine whether its admission was harmless beyond a reasonable doubt.' " *Id.*, quoting *Arizona v. Fulminate*, 499 U.S. 279, 307-308, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). A trial error is subject to a harmless-error analysis. *Fisher* at ¶ 9.

Structural error, however, cannot be analyzed under harmless-error standards because that type of error affects " 'the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself.' " (Brackets added in *Fisher*.) *Id*., quoting *Fulminate* at 310. Structural errors "are 'so fundamental that they obviate the necessity for a reviewing court to do a harmless-error analysis.' " *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 20, quoting *State v. Hill*, 92 Ohio St.3d 191, 199, 749 N.E.2d 274 (2001). If structural error exists, the judgment must be reversed.

{¶ 141} Structural error has been "recognized only in a limited set of circumstances involving fundamental constitutional changes, including the denial of counsel to an indigent defendant, the denial of counsel of choice, the denial of self-representation at trial, the denial of a public trial, and the failure to instruct the jury that a defendant's guilt must be proved beyond a reasonable doubt." *Jones* at ¶ 22. The relevant question is whether the error deprives the accused of a constitutional right so basic to a fair trial that the infraction can never be treated as harmless error. *Id.* at ¶ 26.

{¶ 142} Montgomery argues that by designating the victim as the state's representative and allowing her to sit at the state's counsel table, the trial court and the state essentially vouched for her credibility, causing prejudicial error. As illustrated clearly in the first dissenting opinion, any vouching that occurred due to the trial court's decision to allow the victim to sit with the state and serve as its representative was very limited. The first dissenting opinion correctly notes that the prosecutor did not comment on the victim's credibility or express any personal opinion about her truthfulness. Further, I agree with the first dissenting opinion that any connection between A.B.'s believability and introducing her as the state's representative and seating her with the state is tenuous at best.

{¶ 143} It is difficult to see how under the facts of this case, the jury would interpret the victim's credibility any differently than if she had merely sat right

behind the prosecutor's table instead of beside the prosecutor at trial. The state brought the charges against Montgomery; if the state had believed that it could not prove his guilt beyond a reasonable doubt, it would not have brought the charges. *See C.K. v. State*, 145 Ohio St.3d 322, 2015-Ohio-3421, 49 N.E.3d 1218, ¶ 16 (prosecutors are under no duty to file charges as soon as probable cause exists if they are not yet satisfied that they will be able to establish the defendant's guilt beyond a reasonable doubt); ABA Criminal Justice Standards For the Prosecution Function (4th Edition), reprinted in Rotunda and Dzienkowski, *Legal Ethics-The Lawyer's Deskbook on Professional Responsibility*, Appx. J (2021-2022), 3-1.4(b) (a prosecutor should not make a statement of law or fact, or offer evidence, that he or she believes is untrue to a court), 3-4.3(a) (a prosecutor should file criminal charges only if he or she reasonably believes that the charges are supported by probable cause and that admissible evidence will support a conviction beyond a reasonable doubt), and 3-4.3(d) (a prosecutor should not file criminal charges if he or she believes the defendant is innocent, no matter the state of the evidence). In a "he said, she said" case, the state's presentation of the victim's testimony tells the jury that the state believes the victim. The jurors know that the state must believe the story, often based on testimony of the state's witnesses, that it presents to prove its case.

{¶ 144} In proving Montgomery's guilt beyond a reasonable doubt, the state must believe A.B.'s assertion that the sexual encounter between Montgomery and herself was not consensual. Having A.B. sit with the state at its table in this case does not provide her with more credibility, because it is apparent to the jury that the state already believed her story when it brought charges against Montgomery.

{¶ 145} Additionally, credibility is not enhanced merely because the victim sits by the prosecutor to present the same testimony that she would have presented if she were sitting behind the prosecutor's table. If a witness's credibility could be

enhanced by sitting beside the prosecutor as the state's representative, then an appearance of enhanced credibility would be present in every case in which a police officer who is a victim serves as the state's representative and in every case in which a lead investigator serves as the state's representative. No court has found prejudice in those cases, and the same rationale applies here. The victim did not have increased credibility, and her placement at counsel's table did not somehow encourage the jury to believe that the prosecutor was acting as A.B.'s attorney. Therefore, seating A.B. next to the prosecutor did not enhance her credibility here. While this may not be true in every case, it certainly is here.

{¶ 146} And the idea that the trial court implicitly expressed an opinion on the victim's credibility by simply allowing the state to designate her as its representative and to seat her at the prosecutor's table is without support. While the Supreme Court of Arkansas may hold that opinion, *see Mask v. State*, 314 Ark. 25, 31, 869 S.W.2d 1 (1993), that opinion is certainly not universal. Other courts permit the state to designate the victim as the state's representative when there is a need to do so, *see Shaw*, 96 Idaho at 901, 539 P.2d 250, or so long as it is not done for an inadmissible purpose, *see Bryant*, 105 Ohio App. at 454, 152 N.E.2d 678. The trial court approved the state's designation of its representative and allowed her to sit at the prosecutor's table and nothing more. The request did not affect Montgomery's access to a fair trial or erode the presumption of his innocence.

{¶ 147} If the trial court's decision was error, it certainly was not structural error. As observed by the first dissenting opinion, no other state court has found this type of decision to be structural error. The trial court's decision to allow the victim to serve as the state's representative and sit at the prosecutor's table would be an error only in the trial process itself, not a violation that permeates the entire trial. *See Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, at ¶ 26. The majority opinion expands structural error in a manner that I cannot condone.

**{¶ 148}** While I believe that the trial court had the discretion to allow the state to choose the victim as its representative, assuming arguendo that it did not, I agree with the first dissenting opinion that any error related to trial court's allowance of this seating situation during voir dire would have been harmless error. And I agree with the first dissenting opinion that Montgomery forfeited his objection by not raising it at the time of trial and that he has not demonstrated plain error because he has not shown that but for A.B.'s one-time introduction as the state's representative and her remaining seated at the prosecutor's table, he would not have been convicted. The evidence in this case overwhelmingly supports the victim's version of events.

## Conclusion

**{¶ 149}** To clear a broader path of cases that may be subject to structural error, the majority opinion wields Lady Justice's sword to cut away the state's right to select a representative to aid it throughout criminal proceedings. I do not believe that the case law supports this policy determination. If the people wish to limit the state's authority to select a representative at trial, then the General Assembly should be the branch to do so. This court should be hesitant to expand constitutional rights in such a manner. Because I would find that there was no error in allowing the state to choose A.B. to serve as its representative in this case, I must respectfully dissent.

_____

Kyle D. Stone, Stark County Prosecuting Attorney, and Kristen W. Beard, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Addison M. Spriggs, Assistant Public Defender, for appellant.

Russell S. Bensing, urging reversal for amicus curiae, Ohio Association of Criminal Defense Lawyers.

_____